CLAY et al. v. WATERS.

BOATRIGHT v. SAME.

(Circuit Court of Appeals, Eighth Circuit. April 1, 1908.)

Nos. 2,628, 2,629.

1. BANKRUPTCY—PROPERTY OF BANKRUPT—TITLE OF TRUSTEE.

The title to money or property belonging to a bankrupt before adjudication vests in the trustee, subsequently appointed, under the express provisions of Bankr. Act July 1, 1898, c. 541, § 70, 30 Stat. 565 (U. S. Comp. St. 1901, p. 3451); but the trustee acquires no title to money or property in the hands of third persons which did not belong to the bankrupt prior to the adjudication.

2. SAME—OWNERSHIP OF PROPERTY—EVIDENCE.

Evidence held to establish that $40,000 secreted in a bank by a bankrupt, within eight months after the adjudication in bankruptcy, belonged to him before the adjudication, and passed to his trustee in bankruptcy by virtue thereof; but otherwise as to money and jewelry found on his person at the time of his death, a year and a half after the adjudication, to which the trustee acquired no title.

3. TORTS—JOINT WRONGDOERS.

When several persons unite in an act which constitutes a wrong to another, intending at the time to commit the act under circumstances which fairly charge them with intending the consequences which follow, they are all jointly and severally liable for the wrong done, regardless of their individual participation in its accomplishment or their individual gain or profit resulting therefrom.

4. BANKRUPTCY—SECRETION OF FUNDS OF BANKRUPT—LIABILITY OF ATTORNEY.

Where, after the death of a bankrupt, who had concealed a large sum of money on deposit to the credit of fictitious persons in a Canadian bank, his confidential attorney went with the bankrupt's mother and widow and represented to the bank that they were the identical persons in whose names the money was deposited, and through his influence procured the payment of such deposit to them, after which such attorney's bank account assumed an importance and magnitude unknown before, which was not explained, and he thereupon immediately invested funds in real estate security and notes to the amount of $6,975, he was properly charged to that extent as a trustee thereof, and was properly required to transfer the same to the bankrupt's trustee.

Appeal from the District Court of the United States for the Southwestern Division of the Western District of Missouri.

R. M. Sheppard and Thomas Dolan, for appellants.

J. W. Halliburton (Samuel McReynolds and H. W. Currey, on the brief), for appellee.

Before HOOK and ADAMS, Circuit Judges, and CARLAND, District Judge.

ADAMS, Circuit Judge. These are appeals from a decree holding Priscilla Boatright, mother of Robert Boatright, and George R. Clay, her attorney, liable for appropriating money and jewelry possessed by Boatright, the bankrupt, at the time of his death, and divesting Clay and his wife, Cora, of title to certain real estate and promissory notes in which some of the money was invested. On December 22, 1902, Robert Boatright was, on the petition of his creditors filed November 22, 1902, adjudicated a bankrupt. He failed to attend the first meeting of creditors before the referee, or to submit to an examination as required, and never filed schedules of assets or liabilities. He absented himself from the jurisdiction of the court, or concealed himself so that compulsory process was unavailing. In August, 1903, he went to Windsor, in the Dominion of Canada, and in the assumed name of "John Bagwell" deposited in the Canadian Bank of Commerce located in that city $40,000 in money to the credit of "John Bagwell," "Polly Bagwell," and "Priscilla Bagwell," and made the same subject to the sight draft of either of them. In May, 1904, Boatright died at Kansas City, Mo. Several thousand dollars in money and some jewelry were found on or about his person. Soon after his death Priscilla Boatright, his mother, and Polly Boatright, his widow, went to Windsor, Canada, accompanied by Clay, the attorney, and by his assistance and co-operation satisfied the officers of the Canadian bank that they were the identical Priscilla and Polly Bagwell in whose names the $40,000 had been deposited by John Bagwell in August, 1903, and each drew out one-half of the amount deposited, with accrued interest, amounting for each to the sum of $20,553.64, and appropriated the same to their own use. In like manner, also, they divided the money and jewelry found on or about Boatright's person at the time of his death in Kansas City. Priscilla Boatright secured between $3,000 and $4,000 of that money and some of the jewelry.

The present suit was a plenary action in equity, instituted by the trustee of the estate of Robert Boatright against Priscilla Boatright, George R. Clay, and Cora M. Clay, his wife, charging that the money and property secured by the co-operation of the first two of them, both at Windsor and Kansas City, belonged to Boatright, the bankrupt, before his adjudication in bankruptcy, and therefore now belonged to complainant trustee, and that some part of the money so secured by them had been invested in certain described real estate and promissory notes, and title thereto taken in the name of George R. Clay, or his wife, Cora, which, therefore, now belonged in equity to complainant. The defendants accepted the issues thus tendered,

a trial was had in the court below, the issues were found in favor of complainant, and $6,975 of the money secured by defendants were found to have been invested in real estate and notes in the name of George R. Clay or his wife. A final decree was entered divesting Clay's title to the land and notes, vesting the same in the trustee, awarding the latter a general judgment against Priscilla Boatright and Clay for $17,575, and directing the former to turn over to the trustee the jewelry which she obtained from Boatright at Kansas City. From this decree the defendants prosecuted separate appeals. As there is only one record, we find it convenient to dispose of both appeals in one opinion.

If the money and property taken by defendants did not belong to Boatright before he was adjudicated a bankrupt, the trustee of his estate acquired no title to them (Bankr. Act July 1, 1898, c. 541, § 70, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]) and cannot recover in this action. If, on the other hand, the money and property did belong to him before the adjudication, title thereto vested in the trustee subsequently appointed, and he is entitled to relief. This issue is one of fact, pure and simple, and the conclusion of the trial court, unless plainly erroneous, should be followed. We do not find it necessary to resort to the analogies suggested by section 70d of the bankruptcy act relating to the effect of setting aside compositions or revoking discharges upon title to property acquired by the bankrupt after his adjudication. Neither do we find it necessary to apply rules governing the burden of proof in controverted issues invoked by counsel.

The facts disclosed by the proof, when given their natural probative force, satisfy us that the money deposited at Windsor belonged to the bankrupt before the date of the adjudication. The main facts may be briefly epitomized as follows: Boatright was a bad man, and much accustomed to crooked and fraudulent practices. He made his money by feigning to conduct real foot races and prize fights, and through that pretense swindling the innocent and guileless. The opinions in the cases of Stewart v. Wright, 77 C. C. A. 499, 147 Fed. 321, and Exchange Bank v. Moss, 79 C. C. A. 278, 149 Fed. 340, sufficiently portray his character, his occupation, and his business methods. So notorious was his infamy that the learned trial judge properly enough observed:

"It is doubtful whether there has ever been a greater scoundrel than Robert Boatright."

He and his associates in crime had become possessed of about $300,000 in money during the 15 months immediately preceding the adjudication. No loss of this money is shown, and only a feeble and unsatisfactory effort to do it is made by the testimony of an accomplice. Boatright failed, and refused after the adjudication to make disclosure of his assets as required by law. He secreted himself, so as not to be compelled to do so. He took $40,000 out of the jurisdiction of the court and deposited it in fictitious, assumed names, subject, among others, to his own draft.

161 F.—52

In this narration we start with the established fact that he and a few associates, of whom he was the acknowledged chief, had an amount of money largely in excess of $40,000 shortly before the adjudication. We end with another indisputable fact that $40,000 in money was concealed by him outside the jurisdiction of the court within eight months thereafter. Meanwhile he persistently and successfully avoided the processes of law, which might have compelled him to disgorge. Why this dodging? Why this removal of money out of the jurisdiction of the court? Why this concealment of it? If he had acquired the money after the adjudication, none of these things would have been necessary. It could not have been taken from him by any processes of the bankruptcy court. Men are presumed to do all things with a purpose, and, when flight, concealment, and expense are resorted to, it is reasonable to presume that such resort was had for a purpose. The natural and reasonable presumption in this case is that they were had for the purpose of concealing the money in question from the reach of the bankruptcy court. Money was found in his possession just before bankruptcy proceedings were commenced, and his subsequent suspicious conduct. and the failure to account for its loss justify us in the conclusion at which we have unanimously arrived that he never did lose it, but, on the contrary, concealed it to escape the demands of his creditors.

Attempt was made to show that Boatright left his accustomed place of operation in Webb City, Mo., conducted elsewhere some of his swindling foot races, prize-fighting contests, and the like during the early part of the year 1903, and thereby accumulated an amount of money in excess of $40,000; and we are asked to indulge the presumption that the money secreted in Canada was acquired by him in the ways just mentioned after the adjudication of bankruptcy and during the first part of the year 1903. Neither the character of the witness relied upon to make this showing, nor his story, inspires our confidence. His story is vague, uncertain, and improbable, and his character leads us to discredit it. We conclude that the $40,000 secreted in Windsor belonged to Boatright before the adjudication in bankruptcy, and consequently passed to his trustee by virtue thereof.

We are not satisfied that the money and jewelry found on his person at the time of his death in Kansas City, in May, 1904, had been. owned by him prior to December, 1902. There is no such evidence of concealment or suspicious circumstances as characterized his action concerning the deposit of money in Windsor. Moreover, a year and a half had elapsed after his adjudication in bankruptcy and before his death. These and other considerations, unnecessary to mention, have brought us to the conclusion that the trustee has failed to make good his claim to the money and jewelry taken by Priscilla Boatright in Kansas City.

The questions remaining for consideration concern the liability of the defendant Clay in this action. The proof disclosed that he had for some time before and after the adjudication of bankruptcy been Boatright's confidential attorney; that he was familiar with his career; that he knew the facts attending the deposit in the Canadian

bank at Windsor; that he accompanied Priscilla and Polly Boatright to Windsor after the death of Boatright to secure the money; that he knew their real names to be Boatright, and not "Bagwell"; that he represented them to the bank as the veritable Priscilla and Polly Bagwell to whose credit the money had been deposited by Boatright; that he knew, when he accompanied the women to Windsor, of the pending proceedings in bankruptcy against Boatright and of the adjudication against him. Such is the general outline of Clay's actual knowledge. It would serve no useful purpose to detail the evidence from which we reach our conclusion; but from the foregoing general facts and the reasonable inferences deducible from them we are satisfied that it was through Clay's interposition, co-operation, and influence that the money was secured from the Canadian bank, and that he knew or had reasonable ground to believe, when he rendered his aid and exerted his influence, that he was aiding in the commission of a wrong. In these circumstances he was properly held liable with Priscilla Boatright for the money which he aided her to secure and wrongfully appropriate to her own use. The accepted rule on this subject is that "when several persons unite in an act which constitutes a wrong to another, intending at the time to commit it, or doing it under circumstances which fairly charge them with intending the consequences which follow," they are all jointly liable for the wrong done, without regard to their individual participation in its accomplishment or their individual gain or profit resulting therefrom. They are joint tort-feasors, and as such jointly and severally liable for the consequences of their wrongful act. 1 Cooley on Torts (3d Ed.) 223, and cases cited.

We have so far proceeded on the assumption that Clay did not share in the fruits of the wrongful act; but this assumption is unfounded in fact. It was through him and in his name that most of the money belonging to Priscilla Boatright was transferred from the Canadian bank to the bank of Neosho, Mo., in which Clay kept his personal account. His own account soon thereafter assumed an importance and magnitude unknown before, and this fact is not satisfactorily explained. Not only so, but he soon thereafter began making unprecedented investments in the purchase of real estate and in loaning money to his neighbors, taking from them interest-bearing promissory notes secured by mortgage on real estate. In view of the earnest contention of Clay's counsel that the money invested by him was his own, and formed no part of the money obtained from the Canadian bank, we have given the evidence on this subject most careful consideration, but find ourselves unable to agree with them. We think the facts, in the light of all the attending circumstances, are inconsistent with their contention, and that the money so invested by Clay was not his own. We agree with the conclusion of the learned trial judge that $6,975 of the Boatright money, which of right belonged to the trustee in bankruptcy, was invested by Clay in the real estate and notes described in the decree below, the title to which was taken in his own name, or that of his wife, the defendant Cora M. Clay. A resulting trust thereby arose in favor of the trustee in bankruptcy,

and the decree below, divesting title from the defendants Clay and vesting the same in the trustee, was accordingly correct.

But our disapproval of the action below in subjecting the money and jewelry taken from the person of Boatright at the time of his death to the demands of the trustee in bankruptcy requires a modification of the decree in the following particulars: The order requiring Priscilla Boatright to deposit the jewelry in the hands of the clerk of the Circuit Court for the use and benefit of the trustee should be eliminated from the decree, and the personal judgment against Priscilla Boatright and George R. Clay should be reduced from $17,575 to $13,578.63, and the latter sum should bear interest at the rate of 6 per cent. per annum from the date of the entry of the decree below. In all other respects the Circuit Court reached the correct conclusion.

The decree must therefore be reversed, and the cause remanded to the court below with directions to enter a decree in accordance with the views expressed in this opinion; and it is so ordered.

NOTE.—The following is the opinion of Smith McPherson, District Judge, on overruling the motion for a new trial:

SMITH McPHERSON, District Judge. This case is by a bill in equity, answer, and replication, with evidence taken. November 22, 1902, proceedings in involuntary bankruptcy were filed in this court by creditors against Robert Boatright, and December 22, 1902, he was adjudicated a bankrupt, and on due proceedings the plaintiff became trustee. The bankrupt did not attend the first creditors' meeting, filed no schedule, and did nothing else required by the bankrupt laws. Claims amounting in the aggregate to $300,000, were timely established against the estate, all based on the frauds and the rascality of the bankrupt in obtaining moneys from the several creditors. May 2, 1904, the bankrupt died. Neither the bankrupt himself, nor the heirs, nor the administrator since his death, has ever made application for a discharge.

It is doubtful whether, in the history of jurisprudence; there has ever been a greater scoundrel than Robert Boatright. I shall not attempt to enlarge upon this statement. The poverty of the English language does not enable me to do full justice to the subject, as will be seen by reference to the case of Wright v. Stewart (C. C.) 130 Fed. 905, and Stewart v. Wright, 147 Fed. 321, 77 C. C. A. 499. At his death on his person was found a large sum of money, namely, about $10,000. After the bankrupt proceedings were pending, the bankrupt deposited in a bank in Canada $40,000, representing himself to be John Bagwell; and he took the certificate of deposit in the name of John Bagwell, Priscilla Bagwell, his mother, and Polly Bagwell, his wife; the certificate being payable to either one or all three. After his death a part of this money was drawn out by these two women, with the assistance of the defendant George R. Clay, a practicing lawyer, then of Neosho, Mo. Part of this money was drawn through a local bank at Neosho, the defendant Clay identifying these women by the name of Bagwell, but whom he had known for quite a time by their correct names; and he likewise was with them at the Canada bank when the money was withdrawn, and he again represented that Bagwell was their true names. Defendant Clay knew Boatright's business, and knew that his means were obtained by illegal methods. The evidence fails to show just when and from whom the moneys above referred to were gotten, and the defendants urge that the title that he has to the property of the bankrupt's estate is of such property as Boatright had an interest in as of the date of adjudication, namely, December, 1902.

Ordinarily there is no question as to the correctness of the proposition that a trustee takes such property only as the bankrupt owned at the date of the adjudication, and that property afterwards acquired cannot go to the creditors in the bankruptcy proceedings. In this case the bankrupt could not get

a discharge, if living, because of his utter failure to schedule his property or to attend the first creditors' meeting, or do anything else that is required of him by the bankrupt law; and the discharge could not be granted him, because not applied for in time. And if he had applied for a discharge, and it had been granted, it would not be a defense as against any one of the creditors herein to the amount of a dollar, because all the debts were created by and through fraudulent and illegal transactions. Section 70d of the bankruptcy statute (Act July 1, 1898, c. 541, 30 Stat. 565 [U. S. Comp. St. 1901, p. 3451]) provides that, if the discharge is revoked, the trustee takes title to all the property of the bankrupt as of the date of the decree revoking the discharge. Section 64c of the bankruptcy statute is to the effect that, if the discharge is revoked, the property acquired thereafter shall be applied to the payment of the debts owing at the time of adjudication; and section 29b provides for imprisonment of a bankrupt who knowingly and fraudulently conceals assets.

Counsel have cited no case as bearing upon this situation, and, as far as I can gather, no court has passed thereon, or if there is such a decision, it has escaped my research. Clearly, under these statutes, if Boatright had been given a discharge, and later on this discharge had been revoked, the moneys found on his person and the moneys in the Canadian bank would be assets passing to the trustee for payment of the claims herein allowed. But there has been no discharge, for one reason at least, namely, that he never applied for one; and he never applied for one because of his willfulness and his utter contempt for this court, shown in many ways, and his utter defiance of the law with reference to bankruptcy proceedings. These persons became creditors because of the rascality and villainies of Boatright. He supplements his rascality and villainies in making these men creditors by additional rascality and villainies in refusing to obey any order of the court and the requirements of the statutes; and these things being so, I cannot see how it is possible for this man to occupy a better or different position than he would occupy if he had effected a composition with his creditors, or had obtained a discharge, and such composition or discharge had been set aside by decree of this court.

Counsel for defendant argue that it will not do to presume that Boatright has committed a crime in order to reach a conclusion in this case. Such an argument is in the face of the fact that there is not one transaction of Boatright in any manner connected with this case but what was a crime; and no violence is done by reaching any conclusion by presumption herein adverse to Boatright. In fact, nothing is to be, or can be, presumed in his favor. The whole story, from first to last, is a narration of scores of events, any one of which would have been the basis for the conviction of a felony before any court having jurisdiction thereof. Defendant Clay was this man's lawyer, and while his lawyer there is nothing to show but that he demeaned himself as a lawyer should. But the facts remain that he was familiar with Boatright's life. He was well acquainted with him. He knew his wife and mother. He knew them by the name of Boatright, and knew their name to be Boatright. He knew their name not to be Bagwell, and I am using mild language when I say that he had no right to introduce these parties to the bank at Neosho, and vouch for the fact that their name was that of Bagwell; and he had no right to go to Canada with them and there again introduce them to the Canadian bank by the name of Bagwell. Through these agencies moneys were withdrawn. These matters are not satisfactorily explained. These matters were within the knowledge of Boatright and the defendant Clay. The facts within their knowledge are not disclosed. These moneys, used by the defendant Clay and Mrs. Boatright, are not explained. They ought to have been explained.

In my judgment a prima facie case was made by the plaintiff, and such a case was made as called for a full disclosure by the defendants. The moneys thus used did not belong to the Boatright estate. These several pieces of real estate could have been purchased with no other moneys; and the trustee has the right to follow these moneys and subject the property to a sale and the proceeds applied in payment of the creditors.

There will be a decree for the plaintiff.