**HINES, Director General of Railroads, et al. v. HENAGHAN et al.**

(Circuit Court of Appeals, Fourth Circuit.    February 16, 1920.)

No. 1725.

1. **Commerce** ⟨⟩**89—Controversy not required to be submitted to Interstate Commerce Commission.**

A federal court, and not the Interstate Commerce Commission, *held* to have original jurisdiction to determine the right of a railroad company to refuse to furnish cars for loading by a manufacturer of gasoline on a side track built by the railroad company for the purpose, at the expense of the shipper, on the ground that the loading point is too near the main track for safety, in the absence of any statute or regulation on the subject.

2. **Carriers** ⟨⟩**40—Not authorized to arbitrarily discontinue furnishing cars.**

A provision in a contract under which a railroad company built a side track for the use of a large shipper at expense of the shipper, authorizing the company to discontinue its use and remove the track if in its opinion it "is not justified in continuing said side track because it will interfere with the proper operation of said railroad," *held* not to authorize the company to arbitrarily refuse to furnish cars for use of the shipper on said side track, without submitting to a judicial determination of the reasonableness of such proposed action.

3. **Railroads** ⟨⟩**5½, New, vol. 6A Key-No. Series—Federal control held no exemption from suit.**

That a railroad is under government control *held* not to exempt the management from suit to restrain it from arbitrarily refusing to furnish cars to a shipper.

Woods, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Suit in equity by James Henaghan and E. I. Hanlon, partners as Henaghan & Hanlon, and E. L. Roush, against Walker D. Hines, Director General of Railroads, the Baltimore & Ohio Railroad Company, and Charles W. Van Horn, Superintendent. From an order granting preliminary injunction, defendants appeal. Affirmed.

This suit was instituted in the District Court of the United States for the Northern District of West Virginia. It arose upon a bill in equity by Henaghan & Hanlon, appellees, to restrain threatened action of Walker D. Hines, Director General of Railroads, and the Baltimore & Ohio Railroad Company, to discontinue service to and from the siding at the plant of Henaghan & Hanlon at Cornwallis, W. Va. The facts may be epitomized as follows:

The appellees James Henaghan and E. I. Hanlon are partners in trade, doing business under the firm name and style of Henaghan & Hanlon, and their principal income is derived from the manufacture of gasoline from commercial mineral oils and natural gas. Several plants for its manufacture are located in Ritchie county, W. Va., and are connected by pipe lines with a central plant or power house and storage station at Cornwallis, in that state, on the Parkersburg branch of the Baltimore & Ohio Railroad. At Cornwallis their storage tanks for the gasoline received from the field are located on a hill a considerable distance above and back from the railroad. Their power plant is situated on this hill. Lines lead down the hillside to the loading racks, four in number. These loading racks are equipped for loading

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

gasoline into tank cars for transportation and unloading kerosene for use in the manufacture of gasoline. The capital invested in this plant is not definitely known, but amounts to hundreds of thousands of dollars, and the amount received for gasoline on the average is in excess of $2,000 per day. Under the usual construction contract, in the spring or summer of 1915, the Baltimore & Ohio Railroad constructed a side track and switch connection for the appellees for the purpose of loading gasoline upon this side track. This side track connected with a Baltimore & Ohio side track, and not with the main track. One loading rack was erected on this siding. The expense of the construction of this siding was paid by the appellees to the Baltimore & Ohio Railroad Company.

Under contract of May 25, 1918, an extension of about 90 feet was built, the company or Director General being paid for its labor and material. Three additional loading racks were constructed upon this extension of the siding by the appellees, which is used only for storage purposes. These loading racks were used from the time they were installed until the institution of this suit without detriment or injury, actual or threatened, to said railroad or any of its employés or passengers. Nearly all of the gasoline is shipped in interstate commerce. On October 31, 1918, C. W. Van Horn, superintendent, addressed a letter to the appellees, calling attention to their loading and unloading platform at Cornwallis. In this letter the superintendent says: "The government requirements are as follows: 'Loading racks for refinery gasoline, benzine, naphtha, or any liquid with flash point below 20 degrees should be no nearer than 80 feet to main track or to a track over which trains are frequently run. For casing head gasoline, the distance should be at least doubled whenever practicable, but in no case should any loading rack for casing head gasoline be located at a distance less than 100 feet.'" The superintendent in the letter said that the siding in question must be relocated, so that the loading platform would not be less than 100 feet from the company's passing track, and says that if this is not given immediate attention it is most likely it will be necessary to discontinue the handling of gasoline at this point.

It is insisted by appellees that this came as a great surprise, because they knew of no such "government requirement," and they immediately began to investigate the matter, and have not, up to the present time, been able to find any such "government requirement." In this investigation it appears that one of the firm called at the office of the superintendent and made inquiries elsewhere with reference to this matter. During the progress of this inquiry, on January 4, 1919, the superintendent notified the appellees that he insisted on the change being made or he would discontinue placing empties or moving loads from this track on and after February 1, 1919.

It is alleged that to make the change at this point would require several months and the expenditure of such a sum of money as the business would not justify; that in the location of the present siding, a cut of 14 feet in the hillside has been made and the hill is very steep. On the other side of the railroad is the chasm in which flows the North fork of Hughes river; that there is no point available for miles that will permit the use of the 100-foot limit; that with the cut of 14 feet the first loading rack is at a distance of 51 feet and 9 inches from the center line of the passing track; the second is 66 feet and 6 inches from the center line of the passing track; the third is 75 feet and 10 inches from the center line of the passing track; and the fourth is 81 feet from the center line of the main track, the passing track not being any nearer. This hill has been graded back as far as is thought permissible on account of the underlying strata composed of soap stone and impossible to hold from sliding.

The appellees filed six affidavits in support of their contention, and also E. I. Hanlon, one of the affiants, filed a second affidavit. By these affidavits it was shown that the location of the racks was perfectly safe when the cars were loaded under proper restrictions. The court below required the company to receive shipments at only two of the racks in question, to wit: One at 75 feet and 10 inches from the center line of the passing track, the other 81 feet from the center line of the main track, and at these points it was provided that every precaution should be taken to insure safety.

The appellants filed three affidavits, and one of the affiants, Charles P. Beistle, filed a second affidavit, in support of their contention, to wit: That at the time of the making of the side track agreements the railroad company and Director General, respectively, did not know or appreciate, nor were they informed of, the danger resulting or to result from the location, operation, and use of the side track for the purpose and in the manner for and in which the same was employed by the appellees; that the gasoline loaded and shipped by the appellees at and from the rack, or the vapor or gas therefrom, endangered the railroad and trains, passengers, employés, and property thereon, as hereinbefore stated; that in order to prevent or minimize the danger it was necessary to locate the rack at a distance of at least 100 feet from the main track.

It is alleged that such threatened action would result in grave and irreparable loss to the complainants. Injunction affidavits, as we have stated, were filed by both parties, and after due consideration, the court below issued a preliminary injunction, enjoining and restraining the appellants "from failing and refusing to furnish to the plaintiffs Henaghan & Hanlon the service in receiving and transporting gasoline of the said plaintiffs loaded into tank cars on their side track and at their loading platform at Cornwallis, and to furnish said plaintiffs cars at said loading platform in such manner as the said plaintiffs were furnishing such service on and before the 31st day of January, 1919. But it is further ordered that during the existence of this injunction said plaintiffs shall load gasoline only at the third and fourth loading places, being the loading places mentioned and described in said bill and answer as being located respectively 75 feet and 10 inches from the center line of the passing track of the Baltimore & Ohio Railroad and approximately 81 feet from the center line of the main track of said railroad; that the said plaintiffs shall, in loading gasoline for transportation, upon said side track or from said loading places, use the insulated tank cars mentioned in the affidavits filed in this cause, or if at any time such insulated tank cars cannot be had, the said plaintiffs shall use during the running of gasoline into any tank car a perforated dome cover or cap, to one of the perforations of which the loading pipe shall be tightly connected, and to the other perforation of which a vent pipe shall be tightly connected, and through which the vapor or gas arising into the dome of the tank car shall be drawn back by suction into the compressor or tanks of the said plaintiffs; that before loading any tank car, the same, and the loading pipe through which the gasoline is run into the tank car shall be carefully inspected by the said plaintiffs to guard against all leaks or other defects; that in case of the approach of a locomotive on either the main track or passing track during the loading of any tank car, the running of gasoline into the tank car shall be suspended during the time within which said locomotive is within dangerous proximity; that said plaintiffs shall maintain and operate at said platform proper equipment for the application of water and steam, in order to dissipate any escaping vapor; and that in all respects due care shall be taken in and about the loading of any such tank car, and the management thereof and of said loading platform, in order to prevent the escape of vapor and to prevent the explosion or conflagration of or from such gasoline or the vapor thereof."

This is an appeal from the order in question.

George M. Hoffheimer, of Clarksburg, W. Va. (E. Bryan Templeman, of Clarksburg, W. Va., on the brief), for appellants.

M. H. Willis, of New Martinsville, W. Va., for appellees.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). [1] It is insisted by appellants that appellees should in the first instance have applied for relief to the Interstate Commerce Commission or Public Service Commission of the state, and that, not having

made such application, the appellees have no standing in court, and the bill should therefore be dismissed. It is conceded that the controversy includes interstate commerce. Such being the case, the Public Service Commission of the state of West Virginia is without jurisdiction. This proposition is so clear that we do not deem it necessary to enter into any discussion of the same.

However, appellants strenuously contend that the Interstate Commerce Commission has jurisdiction. After a careful examination, we find no statute which undertakes to confer jurisdiction upon the Interstate Commerce Commission as respects transactions of this character. The Interstate Commerce Commission not having made any regulation as to the distance of a loading rack from the main line, and it further appearing that when these loading racks were established that body was not consulted as to their proper location, we can conceive of no theory upon which the Commission would have jurisdiction. In the case of Danciger v. Wells Fargo & Co. (C. C.) 154 Fed. 379, Judge Pollock said:

"A further contention made by the defendants is that the court of exclusive original jurisdiction in this controversy is the Interstate Commerce Commission, and that this court has no jurisdiction in the first instance to afford to complainants the relief here sought, and much reliance is placed by the defendants on the case of Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553 [9 Ann. Cas. 1075]. From a reading of that case I do not consider it applicable to the state of facts here presented. If the controversy here was as to whether the defendants were charging excessive or unreasonable rates for the shipments tendered by complainants, the case relied upon would to my mind be in point; but as the ground of relief sought by complainants in the case at bar is the performance by defendants of a duty imposed upon them by law, which they wholly neglect and refuse to perform, I think such question is one for the determination of the courts."

The case of Eastern Railway Co. v. Littlefield, 237 U. S. 140, 35 Sup. Ct. 489, 59 L. Ed. 878, is very much in point. There the plaintiff Littlefield and others sought to recover damages from the railroad company on account of the failure of the company to furnish cars for the transportation of freight. In that instance the suit was instituted in the state court of Texas. A demurrer was interposed by the railroad upon the ground that, if the plaintiffs had any right, it arose under the Commerce Act (24 Stat. 379), and that therefore the federal courts had exclusive jurisdiction. It was also insisted that a federal question was presented which should have first been passed upon by the Interstate Commerce Commission. The demurrer was overruled, and a verdict rendered in favor of the plaintiff, and upon appeal the judgment of the Court of Civil Appeals of Texas (135 S. W. 1086) was affirmed by the Supreme Court of Texas (154 S. W. 543). The case was then carried to the Supreme Court of the United States, and that court held that there was no merit in the contention that a federal question was involved.

The powers of the Interstate Commerce Commission are clearly defined by Moore on Carriers (2d Ed.) p. 1759, as follows:

"By the Interstate Commerce Act of 1887, Congress, in pursuance of its constitutional power to regulate commerce among the states, assumed con-

trol of the interstate railway traffic of the country. The principal objects of that act were 'to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar conditions and circumstances; to prevent undue and unreasonable preferences to persons, corporations, or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line; and to abolish combinations for the pooling of freights.' To secure these ends certain regulations applicable to railway carriers engaged in interstate transportation were established, and a commission created charged with the administration and enforcement of the act."

In the case of Chicago, R. I. & P. Ry. Co. v. Lawton Refining Co., 253 Fed. 706, 165 C. C. A. 299, the court said:

"A contention is made that the courts have no jurisdiction over questions relating to the duty of a carrier to furnish cars to a shipper, and that such an order should be made by an administrative body; but counsel do not advise us of any special tribunal having such powers."

In the case of Chesapeake & Ohio Ry. v. Public Service Commission, 242 U. S. 607, 37 Sup. Ct. 236, 61 L. Ed. 520, the court said:

"One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss."

In view of what we have said, we are of the opinion that appellees were not required to apply to the Interstate Commerce Commission, inasmuch as that body did not have jurisdiction over the subject-matter involved in this controversy.

[2] It is urged that, it being provided by the contract between the railroad and the shipper that the railroad is empowered to make such changes as to location of side tracks as it may deem necessary, therefore the proposed changed location of the side tracks is within the discretion of the management of the road. That portion of the contract which is relied upon is as follows:

" * * * If the business of the second party shall not at any time be sufficient to justify the continuance of said side track in the opinion of the chief operating officer of the railroad, or if, in the opinion of such officer, the railroad is not justified in continuing said side track because of changes in its tracks or because it will interfere with the proper operation of said railroad, then and in either event the railroad shall have the right after 60 days' written notice to discontinue the use of said side track and take up and remove all ties, rails, and other materials belonging to the railroad used in the construction, maintenance, and operation of said side track, and abandon the use and operation thereof."

While this provision clearly gives the railroad the right to discontinue side track accommodations, or to make changes in the location of its tracks on account of their interference with the proper operation of the railroad, we do not think it was intended to confer upon the railroad the power to arbitrarily make such changes as are proposed in this instance. However, in the instant case no such emergency as described in the contract has arisen, there being no evidence that there has been any proposed changes of the location of the main

line tracks, nor is there any evidence that the side tracks as now constituted interfere in the slightest with the proper and successful operation of the road.. If it appeared to the Director General that, in order to successfully operate the road, it had become necessary to remove the main line as·originally constituted, or to do any of the other things enumerated in the contract, then in that event there would be great force in the contention of the appellants; but for the reasons above stated we do not think that this provision of the contract can be reasonably construed so as to give the railroad the arbitrary power to refuse to receive shipments, or to require the racks to be moved, until the shipper shall have the opportunity to secure a judicial determination as to the reasonableness or the unreasonableness of such proposed action.

[3] We will now consider the second contention wherein it is insisted that the war power of the government as respects the control, operation, and management of railroads is exclusive and forbids judicial action. That the railroad and its officers have been under control of the government since December 28, 1917, is undoubtedly true.

By act of Congress approved August 29, 1916 (U. S. Statutes at Large, vol. 39, p. 645 [Comp. St. § 1974a]), among other things it is provided:

"That the President in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system' or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable."

In pursuance of this statute, the President issued a proclamation (U. S. Statutes at Large, vol. 40, pt. 2, p. 1734), the material part of which is in the following language:

"Now therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the foregoing resolutions and statute, and by virtue of all other powers thereto me enabling, do hereby, through Newton D. Baker, Secretary of War, take possession and assume control at 12 o'clock noon on the twenty-eighth day of December, 1917, of each and every system of transportation and the appurtenances thereof located wholly or in part within the boundaries of the continental United States and consisting of railroads, and owned or controlled systems of coastwise and inland transportation, engaged in general transportation, whether operated by steam or by electric power, including also terminals, * * * to the end that such systems of transportation be utilized for the transfer and transportation of troops, war material and equipment, to the exclusion so far as may be necessary of all other traffic thereon; and that so far as such exclusive use be not necessary or desirable, such systems of transportation be operated and utilized in the performance of such other services as the national interest may require and of the usual and ordinary business and duties of common carriers.

"It is hereby directed that the possession, control, operation and utilization of such transportation systems hereby by me undertaken shall be exercised by and through William G. McAdoo, who is hereby appointed and designated Director General of Railroads. * * *

"Until and except so far as said Director shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission, and to all statutes and orders of regulating commissions of the

various states in which said systems or any part thereof may be situated. But any orders, general or special, hereafter made by said Director, shall have paramount authority and be obeyed as such."

By this proclamation, Newton D. Baker, Secretary of War, was declared to be vested with the possession and control of the various systems of transportation located wholly or in part within the boundaries of the continental United States, which had the effect of transferring the possession of all transportation lines from private to government ownership through the Secretary of War.

Section 10, chapter 25, of the Act of March 21, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), defines the extent to which actions at law and suits in equity may be instituted against the Director General while the roads are under the control of the government. That portion of this act which we deem pertinent to the question now before the court is in the following language:

"That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. * * *

"That during the period of federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the Commission pending final determination.

"Said rates, fares, charges, classifications, regulations, and practices shall be reasonable and just and shall take effect at such time and upon such notice as he may direct. * * * *"

By this act it is made perfectly plain that actions at law or suits in equity may be brought by and against such carriers upon which judgment may be rendered as now provided by law. It is significant that Congress among other things should have provided that—

" * * * No defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. * * *"

Thus it will be seen that the statute by express terms provides that actions at law or suits in equity may still be instituted against the Director General, and that he or those under him shall not have the right to plead as a defense to any such action that the carrier is an instrumentality or agency of the federal government. This, we think, disposes of the contention that this suit is an interference with the government in its management and control of the railroads.

It is obvious that it was the purpose of the act to give the President and those acting under him in the operation of the roads and the doing of those things necessary to promptly transport soldiers, material, and equipment, the exclusive control and management of the same. In harmony with this construction, it is provided that no execution shall be issued upon any judgment obtained against the Director General,

etc. In other words, all parties are inhibited from doing anything which might in the slightest degree interfere with the successful operation of the road for the purposes mentioned. This, we think, clearly defines what may or may not be done in the operation of the road during war times. It would be unreasonable to say that Congress intended that the property of the shipper could be taken in a high handed and arbitrary manner, without giving such shipper an opportunity to have his rights as respects the same judicially determined. The court below had the facts before it in the form of affidavits, and upon which it found that the plaintiffs were about to suffer irreparable injury and that no such emergency existed as to require immediate and arbitrary action on the part of the Director General. The order above quoted shows that the court limited the injunction so as not to require the defendants to receive shipments at those points nearer to the passing track than 75 feet, and it was further provided that the same should not be loaded at times when the cars of the main line were passing, and other restrictions so as to insure practical safety.

It appears that a portion of these racks were located while the roads were under private ownership, and finally, under contract of May 25, 1918, an extension of 90 feet was built under the direction of the Director General at a time when the railroad was being operated by the government, and the cost of labor and material for the erection of the same was paid by the appellees, thus giving the assent and sanction of the government management to the location of the same, the establishment of which required large expenditures to be made by the appellees, and it is significant that during this period not a single accident has occurred at this point. It further appears that the Director General is allowing the Pennsylvania Railroad to operate racks of a similar character at a much shorter distance from the main line, to wit, 30 feet.

Under these circumstances it would be a high-handed proceeding for the government, through its agents, to refuse shipments at the racks in question, without first affording, as we have said, the shipper the right to have the question of the reasonableness or unreasonableness of the proposed change determined by the court. After a careful consideration, we are of the opinion that the action of the lower court in granting the preliminary injunction was proper, inasmuch as it appears that there was no such emergency as to require immediate action on the part of the appellees.

It further appears that a compliance with the demands of the appellants would entail an enormous expenditure and work irreparable injury, in the event it should be finally decided that the appellants were not warranted in demanding the proposed change. Therefore, we are of the opinion that the order granting the preliminary injunction should be continued until the hearing.

For the reasons stated, the order of the lower court is affirmed.

WOODS, Circuit Judge, dissents.