ROBERTO HERNANDEZ, Inc., v. ARNOLD
BERNSTEIN SCHIFFAHRTSGE-
SELLSCHAFT, M. B. H., et al.

District Court, S. D. New York.
Jan. 25, 1940.

Joseph K. Inness, of New York City, for plaintiff.

Burlingham, Veeder, Clark & Hupper, of New York City (Roscoe H. Hupper and Burton H. White, both of New York City, of counsel), for defendants Compania Espanola de Navegacion Maritima S. A. and Compagnie Generale de Navigation a Vapeur Cyprian Fabre.

GALSTON, District Judge.

This action is brought pursuant to the provisions of Title 46 U.S.Code, Sec. 829, 46 U.S.C.A. § 829. The complaint alleges that the plaintiff was engaged in buying, selling and exporting automobiles; that the three defendants are common carriers of merchandise for hire by water between ports of the United States and foreign ports and subject to the provisions of the Federal Shipping Act of September 7, 1916, 46 U.S.C.A. § 801 et seq.; that in or about the month of June, 1934, plaintiff had a contract with one Thomas de Bareno of Bilbao, Spain, wherein plaintiff undertook to purchase trucks, pleasure cars and chassis manufactured by Chrysler and General Motors companies, and to ship such automobiles of the aggregate worth per month of $25,000 to the said de Bareno in Bilbao, Spain, from June to December 1934. It is alleged that on numerous occasions during that period the plaintiff requested bookings of freight space on the vessels of the defendants for the shipment of said automobiles; that the defendants refused to book such shipments for the plaintiff; that such refusal was unjustified, unlawful and discriminatory and in contravention of the Federal Shipping Act. It is also alleged that in June 1934, upon the refusal of the defendants to furnish freight space, plaintiff advised the defendants of its contract with de Bareno and the terms thereof, and that the plaintiff would suffer damage to the extent of its commission of 15% on the aforesaid shipments. Plaintiff alleges that it was ready, able and willing to deliver the automobiles to the defendants for shipment to Bilbao, Spain and to pay the proper charges therefor. It is alleged that these defendants wrongfully conspired among themselves to prevent the shipment of said automobiles by the plaintiff and that by reason of such refusal on the part of the defendants to furnish freight space the plaintiff sustained damage in the sum of $25,050 with interest from December 1 to December 31, 1934.

It is alleged that the plaintiff filed a complaint against the defendants with the United States Shipping Board claiming reparations; that the said claim was presented and duly argued before the United States Maritime Commission and that said Commission entered an order dated May 25, 1939, awarding damages to the plaintiff against the defendants, jointly and severally, in the sum of $25,050 with interest from December 31, 1934. The complaint concludes with an allegation that the aforesaid order has not been complied with and accordingly seeks judgment against the defendants.

The defendant Arnold Bernstein, Schiffahrtsgesellschaft, M. B. H., was not served in this action. The remaining two defendants filed what in effect was a general denial on the merits and at the trial sought to establish a number of defenses among which the following may be noted: That the Maritime Commission was without jurisdiction of the proceeding; that there was no joint and several liability of the defendants; that there was no basis for the plaintiff's claim of damage and that it was the duty of the plaintiff in the event that it was entitled to damages to endeavor to mitigate them.

The United States Maritime Commission rendered its first decision on December 20, 1937. The Commission found that on June 24, 1934, in the City of New York, the complainant and J. T. de Bareno, an automobile dealer of Bilbao, Spain, had made an oral contract by the terms of which the complainant was to ship to him automobiles of General Motors and Chrysler manufacture; that the agreement ran from June to December 1934, during which time the complainant was to ship an average of $25,000 worth of automobiles per month, f. o. b. New York, exclusive of complainant's commission of 15%; that complainant was to purchase the automobiles at 17½% off factory retail price. An initial letter of credit in the amount of $14,200 in connection with the agreement was opened by de Bareno on July 2, 1934, effective under extension to October 2, 1934.

Applications for bookings were made to the three shipping lines in question at various times during the period. These applications were made by a representative of the Seven Seas Mercantile Transport Company, an agent employed by the plaintiff to procure bookings, as well as by complainant's president. So far as the Bernstein

line was concerned the bookings were for lots of 10, 20, 22 or 23, 12 or 15, and from 4 to 10, 25 or 20 to 30, and from 1 to 20, and were for any number from 1 to 100, and in effect were for any space on any sailing. This line carried one unboxed Dodge sedan for the complainant on August 25, 1934, but in the name of a vice-consul of a foreign country located in New York City, though booking for this car had previously been refused complainant's agent and complainant's president. The finding of the Commission is that the Bernstein line had unoccupied space for from 15 to 25 unboxed automobiles available on the September 12 sailing, for probably 30 to 40 on the October 23 sailing, and for 160 on the November 27 sailing.

Just exactly what space was available on the sailings of Compania Espanola de Navegacion Maritima, S. A., does not appear from the findings. It does appear that the defendant submitted in evidence stowage plans of its vessels sailing October 11 and December 13, which plans indicate that unboxed automobile space in such vessels, except in their lower holds, where unboxed automobiles could sometimes be stowed, was fully occupied.

The Fabre line to Bilbao carried complainant's automobiles consisting of 4 boxed truck chassis on the sailing of October 8, and one shipment of 3 boxed truck chassis on the sailing of November 5. These automobiles were booked by Seven Seas as "Rios and Whites" as described to Seven Seas by complainant's president. The Commission found that there was unoccupied space for unboxed automobiles available on the sailings of this line on August 7, September 7, October 8 and December 10.

During the period in question, the defendant carriers, together with the Compania Transatlantica, comprised the membership of the North Atlantic Spanish Conference, and no service was available from New York to Bilbao except via these Conference lines. Application for booking to Compania Transatlantica was refused with the statement that it had space but complainant's automobiles could not be accepted because their wheel base exceeded a length of 115 inches.

The Commission found that complainant's practice in exporting unboxed automobiles was to procure steamship bookings and subsequently purchase the automobiles therefor.

As explaining its finding of unfairness and discrimination the Commission determined as a fact that the complainant's delivery price in Spain of automobiles it desired to ship to Bareno was less than the delivery price of similar cars received by manufacturers' distributors in Spain. An agent of the Bernstein line had said that a distributor in Spain gave such line more business and would be protected, and that such carrier was not interested in complainant's cars and that complainant had "no chance in the world" to get space in August or the following month "or ever". The agent of Compania Espanola de Navegacion Maritima S. A. is reported to have said that it was pressed by a distributor in Spain not to carry complainant's cars and that it could not accept any Chrysler or General Motors cars from complainant, but would take any others; and by Fabre line's agent that none of the Conference lines would accept complainant's cars because of requests from Spain and from General Motors and Chrysler people in the United States.

Bearing on the same issue complainant introduced in evidence before the Maritime Commission minutes of a meeting of defendants' Conference, held July 14, 1934. Therein the Conference authorized dispatch of a joint reply to cables to them from an automobile distributor in Spain. The finding is that the defendants expressed a wish to cooperate with such distributor; stated that the Conference could not refuse shipments of independents and that "up to present no cars shipped".

In addition to the finding of fact that complainant had made the agreement with de Bareno, the Commission found that "the weight of evidence is that the defendants' agents were informed of complainant's agreement with de Bareno."

Thus the Commission concluded that the defendants unfairly treated and unjustly discriminated against the complainant in violation of Paragraph 4 of Sec. 14 of the Shipping Act of 1916, and that complainant was injured by such violation. The report, however, observes that there was no showing that all of the cars represented upon which the reparation requested was based could have been carried by defendants, or what amount of space was available, nor of the value of the cars

which could have been carried in such available space. So the Commission held that the complainant had failed to establish the extent of its injury. An order thereupon was entered assigning the case for further hearing solely with respect to the measure of complainant's injury.

Thereupon further hearings were held and a second report of the Commission was filed on May 25, 1939. The Commission sought to determine how many cars were required to fulfill the contract. Based on what apparently is a purely arbitrary analysis of speculative figures the report shows:

"The following figures from complainant's analysis show the type of cars of which the greatest number would be required to aggregate the contract amount, $167,000:

| Car | Type | Net Price |
|---|---|---|
| Chevrolet | 1½ Ton Chassis | $400.12 |
| " | 5 Passenger Master Six | 528.00 |
| Pontiac | 5 Passenger 4 Door Sedan | 664.12 |
| Dodge | 1 Ton Truck Chassis | 424.88 |
| Plymouth | 5 Passenger Town Sedan | 540.38 |

"At $400.12, the lowest net price appearing in the analysis, 417 units would be necessary to fulfill the contract. At $511.50, the average net price of these models, 327 units would be required."

The Commission next sought to determine the amount of space the defendants had available for automobile shipments and concluded that on the various voyages the Bernstein line could have carried from 205 to 225 more automobiles than were transported; that the defendant Compania Espanola de Navegacion Maritima could have carried 141 more cars and that the defendant Fabre could have carried 239 more cars. There was no finding of what size cars could thus be stowed on any particular sailing.

An important matter for consideration is whether the complainant could have obtained cars in any event, for concededly the applications for bookings were made before the complainant had purchased or sought to purchase any cars. The Commission found that the complainant declined to reveal the names of the persons from whom cars could be purchased but did specify certain cities as, for example, Pontiac, Michigan, and Windsor, Canada, where cars could be obtained. The defendants developed that the complainant had no direct contacts with dealers in Pontiac and Windsor. There is some testimony by a witness, as found by the Commission, that he could have obtained for complainant at any one time 300 to 500 automobiles, trucks and chassis of General Motors and Chrysler manufacture at a discount of 17½% or more off factory retail prices. The Commission found that another representative of dealers could have obtained for complainant 1000 such cars. Thus the Commission concludes that the complainant could have obtained and shipped $167,000 worth of automobiles in compliance with its contract and in accordance with the bookings requested, and accordingly concluded that the complainant's net profit would have been 15% of $167,000, or the sum of $25,050, and entered the order which is the subject matter of this litigation.

It is contended by the defendants that the Maritime Commission was without jurisdiction and reliance is had upon Danciger v. Wells, Fargo & Co., C.C., 154 F. 379; Hines v. Henaghan, 4 Cir., 265 F. 831; Royal Brewing Co. v. Missouri, K. & T. R. Co., D.C., 217 F. 146; Louisville & N. R. Co. v. F. W. Cook Brewing Co., 223 U.S. 70, 32 S.Ct. 189, 56 L.Ed. 355; Powers v. Cady, D.C., 9 F.2d 458; Turner Dennis & Lowry Lumber Co. v. Chicago, M. & St. P. R. Co., 271 U.S. 259, 262, 46 S.Ct. 530, 70 L.Ed. 934; Illinois Central R. Co. v. Mulberry Coal Co., 238 U.S. 275, 281–283, 35 S.Ct. 760, 59 L.Ed. 1306; Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 196, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas.1915A, 315; Pennsylvania R. Co. v. Puritan Coal Mining Co., 237 U.S. 121, 128, 35 S.Ct. 484, 59 L.Ed. 867; Great Northern R. v. Merchants' Elev. Co., 259 U.S. 285, 294, 42 S. Ct. 477, 66 L.Ed. 943. But none of these cases concerned the Federal Shipping Act. The Act was construed, however, in United States Navigation Co. v. Cunard S. S. Co., 284 U.S. 474, 52 S.Ct. 247, 251, 76 L.Ed. 408.

Whether in the circumstances set forth in the complaint before the Maritime Commission there was also a common law remedy available to the plaintiff is beside the point; for it abundantly appears from United States Navigation Co. v. Cunard

S. S. Co., supra, that the provisions of the Shipping Act were ample to give the Commission jurisdiction, for the plaintiff relies on a statutory right. Mr. Justice Sutherland said, referring to the Shipping Board Act: "If there be a failure to file an agreement as required by section 15, the Board, as in the case of other violations of the act, is fully authorized by section 22, supra (46 U.S.C.A. § 821), to afford relief upon complaint or upon its own motion. Its orders, in that respect, as in other respects, are then, under section 31 (46 U.S.C.A. § 830), for the first time, open to a judicial proceeding to enforce * * *."

Title 46 U.S.C., Sec. 821, 46 U.S.C.A. § 821, in part provides: "Any person may file with the board a sworn complaint setting forth any violation of this chapter by a common carrier by water * * * and asking reparation for the injury * * *."

Title 46 U.S.C., Sec. 812, 46 U.S.C.A. § 812, in part provides that no common carrier shall "4th. Make any unfair or unjustly discriminatory contract * * * or unjustly discriminate against any shipper in the matter of (a) cargo space accommodations or other facilities * * *".

Sec. 829 of Title 46 U.S.C., 46 U.S.C.A. § 829, relating to violation of orders of the Board for the payment of money, authorizes the person to whom such award was made to file in the District Court a petition or suit setting forth the causes for which he claims damages and the order of the Board in the premises.

Passing to the next defense it is urged that there is no joint liability of the defendants. This question was argued before the Commission and it clearly appears that there was substantial evidence before the Board to justify its conclusion that the action of the defendants was in concert. There is ample authority to sustain the principle of law cited by the Board in its report of December 25, 1939, that "when several persons unite in an act which constitutes a wrong to another, intending at the time to commit the act under circumstances which fairly charge them with intending the consequences which follow, they are all jointly and severally liable for the wrong done, regardless of their individual participation in its accomplishment or their individual gain or profit resulting therefrom." 62 Corpus

Juris, p. 1135; Clay v. Waters, 8 Cir., 161 F. 815; The Ross Coddington, 2 Cir., 6 F. 2d 191.

On the whole, then, the first report of the Commission, finding that the plaintiff was unfairly treated and unjustly discriminated against in the matter of cargo space accommodations in violation of paragraph 4th of Sec. 14 of the Shipping Act of 1916, 46 U.S.C. Sec. 812, par. 4, 46 U.S.C.A. § 812, subd. 4, must be sustained; and there was no new evidence developed at the trial of the case in this court which would justify a different conclusion.

However, determination of the amount of damages gave the Board such difficulty that it was unable, when the record first came before it, to make a determination of an award. The new evidence offered does not in my opinion cure the glaring defect which the Commission clearly recognized in its first report.

There are still too few constants and too many variables to enable any satisfactory calculation of damages to be made. Among the few known constants is the calculation of cargo space available on each sailing. In the unknown group of factors the following must be emphasized:

(a) There is no proved financial ability of the plaintiff to purchase $167,000 worth of cars within the period from June, 1934, to December 31, 1934. Certainly such financial ability cannot be inferred from the initial credit of $14,200 that had been established by de Bareno for the account of the plaintiff, although de Bareno in his deposition taken in Bilbao answered "Yes" to the following interrogatory: "If a letter of credit was opened by you in favor of Roberto Hernandez, Inc., kindly state whether you were ready, able and willing to open additional letters of credit in favor of Roberto Hernandez, Inc. to fulfill the entire contract entered into between you and Roberto Hernandez, Inc." There is no proof that de Bareno was able to finance the contract beyond his bare assertion as appears in the foregoing quotation. He had previously stated in answer to another interrogatory that as soon as the cars were ready to be shipped from the port of New York he was to be notified by cable, at which time he was to cable the money or open a letter of credit in favor of the plaintiff.

But what funds were available to meet the antecedent purchase of the cars by the

plaintiff prior to their shipment to New York does not appear. Indeed in passing it may be observed that the plaintiff in its letter of September 19, 1934, to Garcia & Diaz, explained a belated payment to them of a freight charge of $93.75 by saying: "The reason why I did not send you this remittance before is due to the fact that, as you know, business in South America have been very slow and collections very poor; in fact, I still have a lot of pending collections there."

(b) The availability of cars of the manufacture designated in numbers and wheel base to meet the space open on any designated sailing was not proved by substantial evidence. The plaintiff did not have the cars on hand nor in transit. No dealer testified that he had in his possession available for shipment to New York the cars which would have filled the cargo space on any particular day. It is true that there was testimony given by a dealer in used cars that he could have obtained cars for the plaintiff during that period in satisfactory numbers and at the discount price; and that another witness who made his offices with the plaintiff testified that he represented dealers of other cities and also could have procured such cars. But neither of these witnesses owned the cars or had possession of them, nor established such control as would justify the inference that they were able to make delivery to meet space requirements on any definite day of sailing.

(c) The arbitrary figures set forth in plaintiff's analysis of the types of cars of which the greatest number would be required to aggregate the contract amount is not proof that these particular cars were available at the particular prices and in the particular units to meet the particular space accommodations for any definite sailing.

[4, 5] There has been no judicial construction, so far as has appeared, of Title 46 U.S.Code, Sec. 821, 46 U.S.C.A. § 821, in respect to the provision relating to reparation for injury. The Commerce Act, Title 15 U.S.C., Sec. 15, 15 U.S.C.A. § 15, provides that any person who was injured in his business or property by reason of anything forbidden in the anti-trust laws may bring suit and shall recover three-fold the damages by him sustained. The comparable provision in the Shipping Act does not permit of the award of three-fold dam-

ages, but the cases under the former act afford perhaps some illumination in respect to the determination of damages. It may be concluded from such cases as Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, and Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S. Ct. 248, 75 L.Ed. 544, that a defendant whose wrongful conduct has rendered difficult the estimate of the precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness or precision as otherwise would be possible. Those cases hold the damages are not rendered uncertain because they cannot be calculated with absolute exactness, and that it is sufficient if a reasonable basis of computation is afforded, although the result be only approximate. Because of the variable factors which have been enumerated hereinbefore no such situation is disclosed in this record, for in Eastman Kodak v. Southern Photo Materials Co., supra, for example, it appeared that the plaintiff had an established business and that future profits could be shown by its past experiences. So the court found it was permissible to arrive at net profits by deducting from the gross profits of an earlier period an estimated expense of doing business. In Story Parchment v. Paterson, supra, the action arose also under the anti-trust act to recover damages from an alleged conspiracy. It was said that there was evidence from which the jury reasonably could have found that in pursuance of the conspiracy respondents sold their goods below the point of fair profit; that the plaintiff had an efficient plant and sales organization and was producing a quality of paper superior to that of the three defendants, and that current prices were higher during a period anti-dating the unlawful combination than afterward.

In the instant case, to repeat, there is no showing as to what funds beyond the initial credit established by Bareno were available to the plaintiff; no proof of cars on hand to meet any particular sailing; nor of the cost of such cars thus available, nor their size; nor their availability for shipment beyond the vague testimony on the part of the witness who made his office with the plaintiff that they could have been delivered within 72 hours from date of order. Nor is there proof that the arbitrarily selected units clas-

sified by the plaintiff could thus be delivered for any particular sailing. With so many elements of speculation involved, no approximation of estimated damage can convincingly be made, even within the liberal rule set forth in Eastman Kodak v. Southern Photo Materials Co., supra.

Finally it may be pointed out that there was a burden upon the plaintiff to mitigate its damages, even though the right to recover, set forth in the complaint, was wholly statutory. There was no evidence adduced before the Commission nor in this suit to show that the plaintiff had endeavored to do so. The defendants, on the other hand, did show that there was available a substitute service for the direct shipment from this country to Bilbao and that such transshipment via British or continental ports on through bills of lading was entirely feasible. The record discloses that such shipments of automobiles had been effected by the Studebaker Export Corporation on through bills of lading to Spain via Antwerp, in connection with the Red Star line operating from New York in 1934. Defendant's witness Irons, president of a freight brokerage corporation, testified that cars could be shipped via Antwerp on through bills of lading at the same rates as those governing the direct lines. Dorsey, an experienced shipping man, testified that in the period of 1934 there was generally ample space available on all steamers in North Atlantic ports in the United States to Europe and the Mediterranean. The transshipment rates were the same as those by direct shipment.

Another shipping expert, Sinclair, said that it was the practice of the continental and United Kingdom lines to compete with direct Spanish carriers by carrying traffic through to Spain at the same rates as the lines running direct to Spain.

The plaintiff contends that his contract with de Bareno required it to ship over the Spanish Conference lines. The contract was oral and it is significant that in the letter of credit established by de Bareno for the plaintiff on July 2, 1934, there is no such limitation. Moreover there is no good reason advanced to show why de Bareno would not have been satisfied with delivery at Bilbao irrespective of what particular route the shipment took. The directness of the shipment does not appear to have been a material element of the contract, assuming for the moment that it was included in the talk that de Bareno and the president of the plaintiff and Hernandez had when this oral contract was made. It may be noted on this question of immateriality of direct shipment that plaintiff had a contract with members of the North Atlantic Spanish Conference, dated March 31, 1934, which contained the following provision: "If the Carriers fail to furnish space after the Shipper duly applies therefor, the Shipper shall be free with respect to such shipment to secure space elsewhere without prejudice to his right to future shipments under this agreement, provided that Shipper first notifies the Carriers and allows them forty-eight hours from receipt of such notice to confirm that said space is not available." These commercial matters are viewed broadly. Harrison v. Fortlage, 161 U.S. 57, 16 S.Ct. 488, 40 L.Ed. 616; Matthew Smith Tea, Coffee & Grocery Co. v. Lamborn, 2 Cir., 10 F.2d 697. Certainly it was not too much for Hernandez to endeavor, if he really believed that a direct shipment from New York to Bilbao was a material condition of the contract, to seek permission for transshipment when he found that direct shipment was barred by the action of the defendants. That it is the duty of the party injured to reduce damages arising from the breach of a contract or otherwise is well settled law.

"It is a fundamental rule that one who is injured in his personal property by the wrongful or negligent acts of another, whether as the result of a tort or of a breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize the resulting damage, and that to the extent that his damages are the result of his active and unreasonable enhancement thereof, or are due to his failure to exercise such care and diligence, he cannot recover." Vol. 8, Ruling Case Law, 442. The Oregon, 6 Cir., 55 F. 666. Warren v. Stoddart, 105 U.S. 224, 26 L.Ed. 1117.

In view of the foregoing the complaint will be dismissed.